Mr. Yeckel. Good morning. May it please the court. My name is Joe Yeckel. I'm here on behalf of the appellants, who I'll refer to collectively as the serial defendants. I intend to concentrate on the first issue, which is the challenge to the trial court's removal of lead trial counsel Greg Manana at the eve of summation and closing argument. And as time allows, I'll move on to other issues to address questions of the court. This court has held that the removal of the party's chosen counsel is an extreme measure that is warranted only when absolutely necessary. That's just a generality. What's the best case around the facts here? On the facts? Including the fact that it was only closing argument and not disqualification. You know, the issue kind of percolated in the early 80s when there were interlocutory appeals. I don't need any history. I ask you for the best case on the facts. On the facts. In the country. I don't, I don't have, I don't have a case that's, that's comparable to this, where at the eve of a summation your lead trial counsel is. It's an extremely deferential review we do. Well, I'd like to address that. And as this court has said, it's, it's, the court's discretion is, is narrowed as the severity of the sanction increases. And that's. Yes, and this was a very unsevere sanction. Removal of lead trial counsel at the, the day of, the day before closing argument in a, in a. He was there, right? He was there at the table. He was there at the table, your honor. He could, he could consult and did, who, who spoke first? Did your, did your clients have rebuttal closing? No, we were defendants. All right. And this court in the. Was there any attempt to consult during the argument that was refused? I was not at, my knowledge, no. I mean, there were objections made to some of the argument, but it was a junior lawyer who had not, at least as far as trial experience goes, had never delivered a closing argument. Didn't the district court essentially say, look, I, this is better for your client than me interrupting closing argument repeatedly. And based on conduct of counsel, that seems like what's going to be happening here. So, I'm going to exclude you from oral argument. But the, the alternative would be I'm going to be all over your, your course of conduct in this court has been less than satisfactory. Now, why is, why is that an abuse of discretion? Or am I mischaracterizing what occurred below? That's, that's what the trial judge said. Consistent with what the trial judge has said. But the, the, the problem with all this is this is a case where millions of documents were exchanged. You have a role as a lead trial lawyer to prepare a closing argument. You don't just start that the day before you give closing or the weekend before you give closing. And to voice that on junior lawyers who have never done it before, weren't expecting to do it before, and, and, and instead of someone who's been planning to do it for three years, is, I think, an extreme sanction. And I, I would just, I would like to just draw the court's attention to the Droste case, which was cited by the Appleys, where they argue that the, it's a harmless error analysis review. And, and this court does say that. And they cite the case, the Supreme Court case of Richards and Merrill v. Kohler, which was in 1985. And that's a case that said, we're not going to let these things be decided by interlocutor review. But they are reviewable. This court cited that case to the proposition that it's a harmless error analysis. But that's not at all what the court said. The Supreme Court said that this court has never held that prejudice is a prerequisite to reversal of a judgment following erroneous disqualification of counsel in either criminal or civil cases. And they didn't decide it today. And Judge Brennan in concurring, Justice Brennan in concurring, urged appellate courts to develop standards for reviewing final judgments that will effectively protect each litigant's right to retain the attorney of choice. And a litigant's right to retain an attorney of choice can be protected under review of a final judgment if appellate courts are willing, when necessary, to set aside verdicts even when they result from lengthy civil proceedings. And so this court should articulate what that standard is. And whether showing of prejudice is required to the removal of a lead trial lawyer. And I'd like to just understand the court's questioning. But I think the issue is, was the sanction appropriate? Was it warranted? Well, what's the remedy? Complete new trial? That would have to be the remedy. And that's what Justice Brennan says in concurrence. You talk about severe punishment to the system. That's severe. Well, it's also part of the process, the traditional function of the trial judge is to rule on objections during closing. And I assure you, if Mr. Manana had gotten up and said something that contradicted one of his prior orders and was ordered to sit down, I don't think I'd have an argument here at all. And I think that would be completely within the court's discretion if he transferred. To what extent is it relevant this was a self-inflicted wound based upon his persistent misconduct during trial before that? That's what I'd like to address briefly, Your Honor. You've certainly reviewed more transcripts than I have, but I've reviewed a lot of transcripts and a lot of complex trials. And I don't see these objections and issues being anything much more than what happens in most trials. Arguments were made, questions were asked of witness, objections were made, the court heard both sides, and they are ruling. How is it that you characterize the trial counsel's performance on appeal? I mean, I don't think you concede any misconduct. Is it aggressive lawyering or something like that? Will you refresh my recollection? How you view it on appeal? How I view? Trial counsel's conduct. I mean, obviously the district court found that there was misconduct and things like that. And what's your position on appeal? That there was nothing or it didn't rise to the level? I don't think it rises to the level. I'm not saying what Mr. Manana did, just as I think some conduct of Anthem's trial lawyers was objectionable and violated discovery or violated motion luminae. That happened. And those sorts of things happen. You issue a curative instruction and the case moves on. I don't think, I mean, Mr. Manana delivered an opening statement that there were no objections. If he was ever going to do something objectionable, he would have had the ability to at least try it there when he's not governed, other than by the objections of opposing counsel and there were no objections there. I think it was just to pre-judge his conduct and say you cannot deliver a closing argument in a case of this magnitude that took three years of discovery, millions of documents and expect one of two lawyers who'd never been in a jury trial for delivering a jury one that hadn't been in a jury trial before, one that never, neither delivered a closing argument before. Was there a motion to continue closing argument or not? I simply don't know. There was not. The jury, the last day of the jury, the jury was there, was retained for one more day. But there was no motion, no motion for continuance. The order to, I think to switch, to remove Mr. Manana as making closing argument was made late on the day on Friday, 4.30ish or so. And there was no motion for continuance. It's just, it's just, one of the things that came up that I think set the judge off is he asked Ms. Evers, who was an anthem witness about a spreadsheet that had 400, or 900,000 and some lines that represented tests that were done. And earlier in the trial, he'd asked another witness the same question, another anthem witness the same kind of question, who testified, Nancy Oser testified, that this is an Excel spreadsheet with over 900,000 lines and each line represented different tests performed. No objection to that. And he asked another witness, now maybe this other witness wasn't competent to testify and that's a, that's a fine objection and it was sustained. And that was the end of it. I just, I just don't see that he was doing anything improper or, or disrespectful or openly confrontational  the trial had Mr. Chikos or Chikos attended? Your Honor, I don't know personally. I, I'm sure it would be in the transcript. I wasn't there. I'm sure the transcript would reflect who's, who's appeared. I know, I know he, he handled one witness. Mr. Montgomery handled another witness. So you, you didn't look at that? Don't you think that's relevant? Well, I mean, they were there. I'm, I'm fairly confident they were there, but I don't know if they were there for the entire day of each trial, each day of trial. Well, I would think you'd make a record on that if, if you thought this was highly prejudicial. Well, the, the transcript is a record, Your Honor. It just, I, I, I think they were there the entire time. Now, wait a minute. Transcripts don't show what sort of, I mean, they don't show minute by minute attendance. They don't show whether counsel that was there for the first conducted one witness and then left for the morning. Transcripts don't show that. Well, I, I. You got to, that's so, if that's not in the record, you haven't, you haven't given us a record that really allows us to balance the prejudice versus the, the harm. Judge, I just, I don't know how I. I mean, if he was, if he is, he had 12 years of trial experience, as I recall? Something like that? He, he had been a lawyer for 12 years. I don't know if it's all, all Well, all right. So he's not a rookie. And if he's there, if he's second chaired the whole trial, I don't, I don't see why the trial judge would think this was that big a deal. And if you didn't cut a record more than I'm hearing this morning, I, I don't see where we have much to review. Your Honor, with that in mind, I'll move on to the, the verdict, or as far as the fraud claim. The, the fraud submission, there were three alternative, there were three fraud submissions in this case. The first one was the traditional actual fraud, fraudulent misrepresentation case that has nine elements. And the evidence shows that the, none of the zero defendants ever made a representation to anybody that was, that contained anything that was false. Isn't the argument that they caused someone else to make a materially false representation? That, that, the representation was made by someone else. And what, what the representation was is, is, what, what was provided by my clients was truthful, accurate information. That information was taken by another party and numbers were added to it. But, but maybe I'm misremembering it. And if I am, please correct me. But I thought the case against your clients was essentially that they caused a third party to make these representations. And if that's accurate, isn't that correct, isn't that something that can go to the jury under Missouri law? Well, that, that isn't, that isn't a, that isn't a fraud. I don't think that's a traditional fraud claim. Well, I didn't ask if it's a traditional fraud claim. I'm asking if it's permissible under Missouri law. And if not, what specific case says it's not? Well, it's just the, this is an indirect fraud case. As, as, as David, the other side has admitted, an indirect fraud requires that the maker of the representation makes a false representation. What's that, direct fraud? No. I'm, the, the maker of the misrepresentation conveys it to somebody else who then, knowing that the misrepresentation is going to be conveyed to a third party. I see. Nothing that was represented by my clients was false. And what's the case that, is there a case that says that's not actionable, what you've just described? Well, that, that would be the, that would be the, the Wagner case, I think, is the one that comes to mind that was cited in our brief. We cite a couple of cases in our brief on that, that issue where, and it's, and it relies on a restatement that's been adopted in Missouri that, that an indirect fraud requires that the maker, make, the maker say something that's then passed along. That wasn't done here. And there's an example of one where, you know, somebody falsifies a, an anonymous reading and that anonymous reading is then passed on to somebody, a dealer who then passes that on to a third party. So, so you're saying you can't, you can't have non, you can't have nondisclosure indirect fraud? The jury found for, for my clients on that issue, that was submitted as the second fraud claim and the jury found for the serial defendants on that issue. No, but you said there has to be an affirmative misrepresentation. That's, that's the That means, that means that the traditional nondisclosure fraud is, is not, can't be indirect fraud? That's what I'm hearing. I'm just trying to clarify your argument. Indirect fraud is where a misrepresentation is made to somebody, but not by the person who is, is, is Yes, but misrepresentations in fraud law include failures to disclose what's material. That's the second fraud claim they submitted, which is different than the jury found for my clients on that issue. That, that issue is not on appeal. The jury found that my clients did not commit fraudulent concealment under the first alternative fraud claim they submitted. They also submitted a No, fraudulent concealment is different than what I'm talking about. I'm talking about material nondisclosures when there's a duty to speak constituting one aspect of fraud law. Right, and that's, and that's recognized as, as a, as a, as a fraud claim, but it's, it's, it replaces the elements of the misrepresentation with the, with an intent to, to, not to disclose with the intent that they rely on that nondisclosure. Jury found for my clients on that claim. So, so your argument, if, I'm working through it here, but it is that there were no fraudulent statements made by your clients. Right, and How about the use of Putnam's tax identification number on claims? Isn't that fraudulent? If, if that's fraudulent, it was made by a different party, and that party was Your party had nothing to do with submitting any Did not submit any bills. No, no bills were submitted by the serial defendants to anybody. They submitted patient data and test data to the hospital that was true and accurate. That data was then taken by the hospital and their billing agent, not my clients, and they added, the billing agent added the TIN number and the NPI number of the hospital to it. My clients did not add that. There may be ways to hold, you, you could have submitted a case on a conspiracy theory potentially against someone in my client's position, but they didn't submit a conspiracy theory that submits that, that, that claim. They submitted a conspiracy, um, claim that requires, um, basically that, that my clients commit actual fraud. And if, if they didn't commit actual fraud, it, it, their conspiracy claim would fail and it, at least as far as the fraud goes. Conspirators commit fraud. Well, counsel, I thought that, um, the evidence was, and, and I really didn't see it, um, challenged in the, in the briefing that the appellants had a contract with, uh, with Putnam, with the hospital that required the hospital to use the particular, um, misleading identifiers. Is that not correct? The contract, they, they, they gave, they gave the right to do the billing to the hospital. The hospital had the right to do all the billing. My clients did not have the right to do the billing. So that's... Sure, but didn't it, didn't it require the use of particular identifiers? The only people that, it required, it said my, it said the hospital was the only one that used the identifier numbers. But that was also... That's not really answering the question. I'm sorry. Didn't it require the use of particular identifiers? It said that the bill shall be submitted using the hospital identifiers. That's the only way the hospital can submit bills, is with its identifier numbers, yes. I think that, I think that's... Okay, and those, and the use of that, of those identifiers, uh, uh, that, uh, a, a, a trial of fact could find that misleading, could it not? If, if, that isn't a, that is not the, that misleading information was added by someone that it wasn't, um, one of the appellants, one of the... But your clients required them by contract to do so. That, that's, that's not, um, that's not, I don't believe that would be an actual fraud claim. That might be, that might be submissible as a conspiracy claim, is they did something, if this was, if this was pled and proven and submitted that my clients did something in furtherance of a conspiracy, they did this with, with an unlawful objective, not submitted, this was not submitted to the jury. But as far as a, an actual fraud claim, that, that, I don't think that, that, that is a submissible claim. The, the, the misrepresentation... I thought, I thought that conspiracy was submitted in... It was, but it, it, it, it's submitted in a way that doesn't require the jury to find anything about any of the parties other than my clients. Well, I mean, that's your interpretation. Well, Your Honor, at this point, I think I've reserved the balance of my time for rebuttal. Thank you. Mr. Perryman. May it please the Court. My name is Neil Perryman. I represent the, uh, Appellees in this case. I'll refer to them as plaintiffs or Blue Cross Blue Shield or BCBS. I don't know much more the Court needs to hear about this, but, um, when you look back at the record of what happened in this case, I, I heard some comments from my opponent about this wasn't that bad. This wasn't that bad. Um, back in 2018, the Court sent out its principles of civility to all the lawyers, uh, which you'll find in the record, where he spoke about how people are supposed to act... You're speaking on the first issue. Yeah. Do you not, would you move beyond that? Well, that's not what I'm interested in, but go ahead. All right. Well, then I won't, then I won't talk much about it. I just, I want to... I'll tell you what I'm interested in. Will you defend the fraud? Um, yeah. Absolutely. And, uh... This doesn't look like fraud to me. First place, Blue Cross Blue Shield had every ability to get the truth. Yeah, well... And it knew, it knew... This is private contract. This isn't Medicare regs or government mandated this or that. There was no patient defrauded. This in-network stuff is created by Blue Cross and Blue Shield and others to maximize revenues and profits. Well, the answer to the question is that, as Judge Kovas mentioned, Section 4.1B of the contract they entered into specifically required that these misrepresentations be made. It was, it wasn't a guess. Where's the fraud? The fraud is, is that these persons got together, invaded a small hospital in Unionville, Missouri, a 15-bed hospital from Florida and Colorado and all over the country, and they submitted bills from patients that were recruited from across the country to funnel them through Blue Cross Blue Shield. By the way... Just, the conduct as described stinks, right? But we still have to fit it into Missouri's understanding of fraud. So that's really what I'm interested in. And it's clear to me, I think, that Putnam, by submitting fraudulent claims, committed fraud. Would you agree with that? Or am I off base on that? In other words, they were the ones submitting the invoices with the incorrect, was it tax identification numbers, I think? So help me link what your clients, or I'm sorry, what their clients did under Missouri law. Okay. So I'll get to that one side. First off, they don't challenge the Fraud Instruction 1 at all on submissibility. They say it wasn't submissible, and judgment as a matter of law should have been granted. That's the issue. So was there sufficient evidence to submit that instruction? This isn't a question of whether or not I whispered in someone's ear and said, hey, tell him my odometer's different. They wrote it down. That was the only reason they went there, is to perpetuate this fraud on the insurer. They went from hospital, they came, remember, they came from Florida, another small hospital, the Blue Cross Blue Shield, cut off their payments on August 23rd, 2016. They then find Jorge Perez, who by the way is in the custody of the United States government right now, goes to, finds this little hospital in North Missouri, calls his friends to be the billing agents so they can maximize these profits from these pretend tests that were supposedly performed by Putnam. By the way, the hospital agreement that they became locusts upon specifically talks about in Section 2.2, excuse me, 4.1b, that it's supposed to be billed, this is billed, hospitals shall bill only for hospital services performed by order of the direction and personal supervision of the hospital. Hospital service is a defining term in the contract. By the way, dated November 1. The blur between contract and fraud in this appeal is dramatic to me. Let's say you go to a jeweler and the jeweler takes something out of the case that looks really nice and says, I've done a lot of research and this is pure amethyst and that's a crock. Yeah. Okay. Now what, now what, when is that fraudulent and when is it not? Do you make a false statement intending that someone rely upon it and they rely upon it to their detriment and it causes them damage? Well, what is the false statement? The false statement. What is the false statement that your opponents made here, that the defendants made? The false statement is the representation to the insurance company that Putnam Hospital conducted the testing by using its TIN, tax identification number, and national provider identifier. That representation was what, on Putnam letterhead under Putnam tax identification number submitted by Putnam to your client, correct? It was actually submitted by a company called Empower, which is another part of this group. Okay, but the opposing side did not make that misrepresentation, did they? I mean, I think that's the argument that they're suggesting. Yeah, they're suggesting that we knew, they knew all about it. They came, they knew about it, granted. Yep. They knew about it and they knew that. But that's the suggestion that, okay, maybe you have a conspiracy case here. But, you know, when I'm looking at a case like Freeman versus Myers, there still seems to be, by the defendant, a misrepresentation that triggers liability for fraud that can then be made to a second person that can be conveyed to the ultimate plaintiff in the case. But help me get around the initial misrepresentation that was made by the defendants in this case. The misrepresentation is found in the contract itself, the exclusive services agreement for reference to that service. Was your client a client to that or a party to that contract? No. This is the agreement between Serodynamics, the blood test company, and Putnam. And Putnam. Okay. So the misrepresentation, was that communicated then? It was intended contractually to be communicated to my client. That's why they went there. Remember, they did this before. They got run out of Florida. They then entered into this deal in North Missouri. Guess what this contract stated? It stated November 1, 2016. They backdated it to August 23. Why is that date important? Because that's the date they got Florida to stop paying them. They knew exactly what they were doing. They all participated. Think about this hypothetical from the Freeman case. So if I make a representation to person B knowing or thinking that they're going to pass it along and someone's going to rely upon it, that could be fraud, right? That's what they say. But if I write it down and tell you, intend for you to do it, that's not, it doesn't make any sense to me. But, I mean, the misrepresentation, you're describing a meeting of the minds here to commit a fraud on a third party. That's a conspiracy case. That's different than Freeman, where you have a misrepresentation that's communicated to a second party and then communicated to a third party. And I just wonder if you're trying to fit the wrong patent in the wrong shaped hole here. And again, your argument, as I understand it, was there sufficient evidence to do that? So, that's what I'm struggling with. The only thing they argue is that their people didn't make a representation. It's very similar to the arguments they make about their lawyer's conduct at trial. Hyper-technicalities and they're missing the forest for the trees. This isn't a case where they walked into the clerk's office and said, hey, just write down the TIN number of a hospital on these bills. They purposed it. They caused it to happen. They made the representation in the contract knowing it would be sent off to a third party. That's the theory. That's what the jury was instructed on. They found it against all four. They also found they knew of the fraud, retained the proceeds of the fraud. They also found they conspired. And that peg fits every single hole under the incredible facts of this case. What was the best evidence that Blue Cross Blue Shield couldn't have found this out with a phone call? In other words, the reliance aspect of it. Your Honor, there is lots of evidence in the record that lawyers get involved in early 2017. They entered into this contract on November 1, 2016, backdating it. Why'd they backdate it? We'll get to that in a minute. They backdated it in the trial. You just want to go on. I'm talking about where's the evidence that Blue Cross Blue Shield wasn't. And its family wasn't just negligent here. How many claims came in before somebody said, oh, this kind of looks funny? A huge spike in claims came through. Okay. How long did it take Blue Cross Blue Shield to not pick up the phone? I think the first letter that went out was in February of 17, just a few months afterward. And how long were the damages after that? I think they changed the rate schedule in March, March 15th, and they fled in June. How many months did we get $20 million for? It didn't take very long. And remember, these things go, a huge computerized system, they did find out about it. Letters were written, and they got misleading. It's all in the record. They wrote letters, they asked for information, and one of the co-conspirators basically lied to them and told them, oh, most of the tests are performed right here at the hospital. They weren't. And you know what they did when they, this is kind of the amazing thing that, if this isn't fraudulent, I don't know what is. They all agreed together, and the conspiracy, as you mentioned, Your Honor, these tests that, they owed $2 million from Southwest Labs with their old partner that didn't pay for blood tests, and $450,000 of bills that Florida Blue said, I'm not paying you because this stinks. They ran them through Putnam's TIN and MPI to get paid. They all agreed to do that. They all knew they were doing it. They all knew that was a false representation. None of these people were Putnam patients. None of these people set foot in North Missouri. So I want to go back to something, because you all are troubled by it, and I want to make sure I'm telling you what our best position is, which is that if under this hypothetical of A makes a comment to B, knowing B is going to pass it along to C, intending that C rely upon it, right? If that happens in the normal fraud scenario, you have indirect fraud under Missouri law. It's clear. In this case, they wrote it down. They wrote down, this is a, you never see this. Does going from A to B have to be a misrepresentation? Yeah, it's a misrepresentation to bill another out-of-state non-network. It's evidence of a conspiracy, but it's a truthful statement, arguably. You and I agree we're going to submit invoices to Blue Cross and use the improper tax identification number. That is a truthful statement, right? It's not a misrepresentation. That's exactly what they did. They just wrote down the element of their conspiracy. The use of the hospital's TIN and NPI is a misrepresentation. That was the position that we took. That's what they can correct. Counsel, as I understand it, and correct me if I'm wrong, the appellates could not have number. They had to go through a hospital or other entity that had a relationship with Blue Cross and had an approved identification number. The identification number was the thing of value to the appellate. That's exactly right. And so, they execute this contract with the hospital, requiring the hospital to forward these bills to Blue Cross and to use the hospital's identification number as if the hospital had done all these tests. Is that right? That's exactly right. The hospital had nothing to do with the testing. The testing was coming from all over the country for patients that were unrelated to Putnam. You may not want to hear this now, but they hired a company called LabMed that went around business just to funnel them through the hospital. By the way, we talk about the hospital. It's a community hospital with volunteer board members. I'm not absolving them for any of their oversight. That's not the point. The point is, is Jorge Perez and David Burns come in from Florida and take over this place because of their contracts. The record is extremely clear that what Mr. Goertz and Mr. Blake wanted to do was they had to find an in-network hospital so they could build their tests through it. That was their whole goal. Their whole goal was they couldn't get paid because they were out of network. They tried to become in-network. Why do they want to be in-network? Network is also a way for insurance companies to credential their doctors. And providers like it when it's in-network because they get paid. When you're out of network, the check goes to the patient, and the patient then owes the provider. By the way, the other thing that happened here is they billed this as if they were the facility. The hospital itself making the billing. Not some third-party provider that's out of network from Colorado. That's what happened here. If you write down your plans to defraud someone and intend that they be relied upon by a third party, I think the evidence is exactly clear. And it was false when it started. It was intended to be false. It was intended to defraud my clients. Should we have acted sooner? I guess we can all sit around now and say, wow, we should have seen this coming. They saw it pretty fast. And they wrote letters saying, what the heck is going on over here? Why is this spike in billing? And they got very misleading responses from the hospital, Jorge Perez and David Burns, both of whom I think are in federal prison right now. We're about to go there. So was there sufficient evidence of fraud given the voluminous record to submit the case to the jury? That's the only question. They're not quibbling with the instruction. There's no objection to it. With respect to their argument about our alternative to the fruits of fraud, it's a correct statement of Missouri law. The references they complain about in the Hess case, the elements of fraud, were all read to the jury. In the alternative, you can find that they knew of the fraud and retained the proceeds. They're liable. That's a correct statement of Missouri law. And the Pelster v. Ray case specifically affirms that statement of Missouri law. By the way, it wasn't objected to either. The conspiracy instruction they take issue with now was unobjected to by them, and it proffered that each of these defendants conspired with these other defendants, with Jorge Perez and David Burns and hospital partners and in power to defraud Putnam. Each one of these claims in the amazing record that was created, by the way, after finding 1,200 allegedly attorney-client privileges months after the discovery closed, that happened. And by the way, Judge, Mr. Chikos was at the trial the whole time to answer your question. On the money he had received claim, I want to point the court to one other thing. The argument on appeals, I understand, is that the defendants should not have been convicted in that count for $18,053,015 because some of the money went to payroll, Putnam's payroll. Take a look at pages 100 to 101, I think, or thereabouts in the transcript, where the testimony is that these folks that came to North Missouri to take advantage of my client's contract and has a right to contract with hospitals, you know, there's no doubt about that. They put the phlebotomist on Putnam's payroll to make it look like they actually worked there when they didn't. That was the evidence. Jury could have easily disregarded that and said the rest of the money, this money was ill-gotten gains for you, this group of four people, and it should be returned. So this all the money he had received carries no water at all. The torturatory affairs claim, knowledge of the contract, you know, the evidence is replete. There is sufficient evidence to establish they knew that Putnam was in-network. They wanted access to in-network badly. They have very much experience. They just left the hospital that was in-network and got driven out, and they weren't justified by entering into a contract that required the defrauding of an insurance company. So with that, I would ask the court, unless there's further questions. I do have one question, and it's back on the attorney sanction issue. Were you present at the trial? I was not present at the trial. But you're familiar with the record? I've been involved in the case from the beginning. Did the district judge caution this attorney during the trial that it needed to change his behavior at risk of some kind of sanction such as this? Yeah, he sure did. In 2018, I said he submitted these principles of civility, making people know. And after that, it was a mess, right, of contention. You've read the record and the orders and stuff. But September 7, 2021, they had their pre-trial conference. And at the pre-trial conference, it's like, man, this is not going very well. You guys have not really followed my rules, not followed my orders. If you don't behave, and I'm paraphrasing, lead counsel may not be lead counsel for some or all of the trial. Two weeks before trial, that happens. The trial begins. On the third day of trial, three different things happen, including attempting to ask a witness whether he'd ever been contacted by law enforcement and was told that what he was doing was illegal. After moving and eliminating, he excluded the guilty plea of one of the co-conspirators. And after a motion eliminating was granted that this type of evidence can't come in, he was trying to miss – the judge thought he was trying to mislead the jury to think there was no illegal activity. While at the same time, he's negotiating with the Department of Justice. So day four, after these three events, he warns them again and says, hey, man, you have to knock it off. Follow my rules. I warned you two weeks ago. What would happen if you didn't do so? The next day, he does what he does with a 30 v. 6 witness asking questions that he shouldn't have been asking her. Actually, and then when he objected to the question, did your sidebar, the judge says, sustained. Don't ask about this. Next question out of his mouth, 1041 of the transcript. He asks the same question again. The judge had had it. He gave him plenty of notice. Extremely patient with him. By the way, in the punitive damage phase, before that phase of trial, I'm out of time. You've answered my question. Oh, sorry, sorry. Thank you, Your Honor. Mr. Yeckel. Thank you, Your Honor. The issue is that they have to fit their claims within Missouri law. And as their breach of tortuous interference with the contract claim, they have not established that my clients ever saw the contract or knew its terms. Did you say that? I didn't hear that. I'm sorry, Your Honor. I'll speak up. The evidence never established my clients ever saw the contract, the provider contract between Anthem and Putnam. They were asked if they saw it at trial. They said no. The law is clear. You cannot rely on a denial to establish as affirmative evidence. And they put on no evidence they ever saw the contract. And Missouri law is that you must show that the defendants had knowledge of facts followed by a reasonable inquiry would have led to a complete disclosure of the contract's relations and rights of the parties. They haven't shown that. Anthem's own contract person, administrator for this contract with Putnam, said that she didn't think that they could be held to the pass-through billing rule because the contract was silent on it. And they were in the process of negotiating to get them to a new, more current template of the contract that did address pass-through billing. These contracts are all different because they might have seen a contract from a Florida hospital years before. It doesn't mean this is the same contract or it prohibits what they were trying to do. And the insurance company is always free to change their contracts, and they did in this case. So they haven't established a knowledge element of the tourist interference claim. And I'll also just add with the civil conspiracy claim, the jurors were told they had to make no, they weren't to decide anything with respect to the co-conspirators in this case. They had to make any decisions with respect to any of them. Yet in the conspiracy instruction, Anthem is saying that the jurors had to decide, that the co-conspirators committed fraud or committed tourist interference to the contract. But the way the instruction is written, it clearly says they agreed to engage in fraud as it's submitted in the instructions against my clients, which would mean they have to, that my clients had to commit the fraud, and my clients had to commit the tourist interference. And if they didn't make a submissive case as that civil conspiracy claim must fail too. Thank you, Your Honor. Thank you, Counsel. Case has been thoroughly briefed and argued. Argument as helpful as always. Lots of issues. We'll take it under advisement.